**GENERAL ELECTRIC CO. v. GOJACK et al.**

**SAME v. STAUFFER et al.**

**Civ. Nos. 280, 281.**

District Court, N. D. Indiana,
Fort Wayne Division.

March 5, 1946.

Leigh L. Hunt and J. A. Bruggeman, both of Fort Wayne, Ind. (Barrett, Barrett & McNagny, of Fort Wayne, Ind., of counsel), for plaintiff.

Oliver A. Switzer, of South Bend, Ind., Hubert McClanahan, of Decatur, Ind., and David Scribner, of New York City, for defendants.

SWYGERT, District Judge.

Both of these suits are complaints for injunction in cases involving or growing out of a labor dispute. The labor dispute involves the demand for a wage increase on the part of the employees of the General Electric Company who are represented by the United Electrical Radio and Machine Workers of America and the present strike of these employees in all the manufacturing plants operated by the plaintiff. Cause No. 280 concerns the plaintiff's factories and facilities in Fort Wayne, and Cause No. 281, the plaintiff's plant at Decatur. The complaints are drawn under the provisions of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., and upon notice to the defendants on an application for a temporary injunction, the court has heard

the testimony of witnesses and arguments of counsel.

The strike began January 15. Between 1,000 and 1,100 employees of the plaintiff at Fort Wayne and Decatur are not represented by the defendant union. Included in this group are executives, supervisors, and foremen. Through negotiations between company and union representatives, certain employees such as plant guards, maintenance men, and payroll workers have entered the plants on passes issued by the union. The union has taken the position that it should have a list of the other employees not represented by the union which the company wishes to have enter during the strike, and that a pass system should be worked out. The company has taken the position that there is work for these employees to do during the strike; that such work can be carried on without the aid of the striking workers; that the union should not have the right to pass on the question of who should receive passes; and that, for that matter, those employees who wish to enter should have free access thereto without a union pass.

Of course, the right of a person to enter the premises does not and cannot legitimately depend on whether he has a pass issued by the union. No one can dispute this, and counsel for the defendants has admitted this self-evident fact. The union's announced excuse for such a prerogative is that the crossing of the picket lines by a great number of people without passes will tend to demoralize the strikers and invite violence.

On the two occasions, both at Fort Wayne and Decatur, when non-striking employees (mostly executives and supervisors who had no passes but carried letters of identification) tried to enter, the picket lines were formed so tightly and in such a manner that those trying to enter were unable to do so without coming in bodily contact with the pickets. In other words, there was mass picketing. Furthermore, intimidating threats were made by those at or near picket lines to the employees trying to enter.

The chief of police was present at the Decatur plant when the two attempts were made there by nonstriking employees to enter the plaintiff's plant in that city. These nonunion employees were told by a union representative at the picket line, "For safe conduct, go to the union headquarters and get a pass," and when the chief of police was asked to escort them through the picket line, he replied substantially as follows: "I can't do you any good; I don't have enough manpower."

The Fort Wayne police were present on the two days when similar attempts were made there. Substantial evidence is to the effect that these law-enforcement officers made no request of the pickets to open up the line to permit the entrance of the executives and supervisors who asked to enter; although in numerous instances they were specifically requested to do so. However, other testimony by a police official is to the effect that the officers did request the picket line to open up but that the pickets did not comply. The evidence shows that the police intermingled with those trying to enter and approached approximately shoulder to shoulder with those employees to the picket line. The record is barren of any evidence that the police attempted to escort any one through the line by going ahead and making an opening. In other words, the only inference that can be drawn from the evidence is that a person who crossed the picket lines on the 7th or 12th of February would have had to come in bodily contact with the pickets although a police officer would have been at his side at the time. No crossing was made as those attempting to enter did not push their way through the picket line and because of this fact no violence or disorder took place.

One of the provisions of the Norris-La-Guardia Act is that no injunction shall be issued by a federal court in a case involving a labor dispute unless the court finds that the "public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." There is testimony from the city and police officials to the effect that the police were not unwilling or unable to maintain law and order and that they had orders to protect the rights and property

688

of those at or near the picket line. The bare truth is, however, that they were unwilling to go ahead of those executives and supervisors who wished to enter, and did not see to it that those employees were able to enter without coming into bodily contact with the tightly packed and moving picket line. It is reasonable to infer that violence did not occur simply because those who had a right to enter and who tried to enter did not forcibly push their way into the picket line. In the light of this, the only conclusion that can be reached is that the police were derelict in their duties by being unwilling to furnish adequate protection.

In this connection, it seems appropriate to point out that the Statutes of Indiana clearly and explicitly define the duties of a police force. Section 48-6110, Burns Indiana Statutes Annotated 1933, provides that, "It is hereby made the duty of such police force * * * at all times * * * to preserve peace; * * * disperse unlawful and dangerous assemblages, and assemblages which obstruct the free passage of public streets, sidewalks, * * * and places; protect the rights of persons and property."

Further in this connection, the following language in Cupples Co. v. American Federation of Labor, D.C., 20 F.Supp. 894, 899, is pertinent. "Obviously, Congress intended that the federal courts should not interfere in labor disputes, even where there was violence or fraud, unless it appeared that the local law-enforcing agencies were unwilling or unable to furnish adequate protection. The question promptly arises: What alleged facts or what proof would be sufficient to establish the fact that local officials are unable or unwilling to furnish adequate protection? Of course, if there should be a definite declaration on the part of those officials or unwillingness to act that would be sufficient in that respect. Likewise, if, after active co-operation by local officials, bloodshed or violence resulted in spite of that co-operation and assistance, the proof of such fact would be sufficient. But certainly Congress did not intend that this court should await the declaration on the part of local officers of their unwillingness to perform their duty. Most certainly it did not intend that this court should stand by until actual bloodshed, strife, and violence occur before it should lend its aid to then merely prevent a repetition of what Congress evidently intended should be prevented in the first instance. Therefore, a reasonable interpretation of the inhibition contained in subsection (e) is that if the facts are alleged or proof adduced which are sufficient to justify the conclusion that absent injunctive relief, the 'local officials' as that term has been defined, are unwilling or may be unable to furnish adequate protection, injunctive relief may be granted by this court."

Paraphrasing the words used in N.L.R.B. v. Indiana Desk Co., 7 Cir., 149 F.2d 987, 995, "the technique employed * * *" by the pickets at Fort Wayne and Decatur "proved effective in keeping the non-striking employees out of the factory." For that reason the picketing about which there has been testimony was unlawfully conducted. "In going to and from work, men have a right to as free a passage without obstruction as the streets afford, consistent with the rights of others to enjoy the same privilege." American Steel Foundries v. Tri-City Council, 257 U.S. 184, 204, 42 S.Ct. 72, 76, 66 L.Ed. 189, 27 A.L.R. 360. And as was stated recently in Carnegie-Illinois Steel Corp. v. United Steelworkers of America, 353 Pa. 420, 45 A.2d 857, 860, "Picketing which results in the intimidation and coercion of officers and employees * * * and denies workmen from legitimate business access to plaintiff's plant is not legal picketing." Access to any and all is undebatable.

While the union representatives announced at the picket line that the employees trying to enter the plant were not being prevented from doing so, the physical facts surrounding the factory gate and the acts of those in charge of the picket line belied this protestation of being "within the law." At the very time when the highest representative of the union present at the picket line was saying that the union pickets were not keeping any one out of the plant by force, threats or intimidation, 50 to 75 pickets were marching closely together (many with their arms on the shoul-

ders of the ones in front) around the entrance gate, and men at the picket lines were saying, "This line won't open; you can't get in," and "Swing on them if necessary, it is your legal right." Statements that no one was being prevented from entering the plant are a mockery when what has just been described were the actual facts.

The Norris-LaGuardia Act contains a number of conditions which the court must find to exist before an injunction can be granted to restrain the commission or threatened commission of unlawful acts involved in a labor dispute. These are limitations on the court's power to grant relief. Not some, but all of these conditions precedent must be present or met. In the present application there is unquestionable proof of the existence of two of these factual conditions, the threat of unlawful acts and the unwillingness of the police to furnish adequate protection. If the existence of these two fact situations were the only ones which the court must determine, the granting of injunctive relief would be amply warranted by the proof.

However, before the court has jurisdiction to grant the relief asked by the plaintiff, a further determination must be made as to whether another condition precedent imposed by the Norris-LaGuardia Act (contained in Section 8 of the act) has been met by the plaintiff company.

While some of the testimony is conflicting as to details, the evidence is clear that the national representatives of the union and high executives of the company first discussed the union's demand for a $2 a day wage increase on August 22, 1945; that a formal demand for this increase was made on September 19; and that on October 25, at a meeting of union and company representatives, the union presented sundry and extended reasons in support of its demand. After the union had voted to strike, the company on December 21, 1945 offered a 10% increase. Subsequent meetings between the union and the company have taken place on this wage dispute.

Section 8 of the Norris-LaGuardia Act provides that, "No restraining order or injunctive relief shall be granted to any complainant * * * who has failed to make every reasonable effort to settle such (labor) dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." It is the defendants' contention that the plaintiff has failed to meet this condition of the Act. The evidence sustains that contention.

The requirement that the employer who seeks an injunction must make every reasonable effort to settle the dispute by negotiation is not fulfilled by his mere willingness to meet with his employees or their representatives. On the other hand, it does not mean that the employer must accede to the demands made of him or that the parties must reach an agreement. Freedom of decision and independence of position are not to be encroached upon or involved. This requirement does mean, however, that a good faith effort in negotiation must be made with the view of reaching a settlement if possible. N.L.R.B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, "Collective bargaining requires that the parties involved deal with each other with an open and fair mind and sincerely endeavor to overcome obstacles or difficulties existing between the employer and employee to the end that employment relations may be stabilized and obstruction to the free flow of commerce prevented." N. L.R.B. v. Boss Mfg. Co., 7 Cir., 118 F.2d 187, 189. Also "Duties imposed by law cannot be discharged by offering shadow for the substance." N.L.R.B. v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713, 723. And further; "Bargaining presupposes negotiations between parties carried on in good faith. The fair dealing which the service of good faith calls for must be exhibited by the parties in their approach and attitude to the negotiations as well as in their specific treatment of the particular subjects or items for negotiation. For such purpose, there must be common willingness among the parties to discuss freely and fully their respective claims and demands and, when these are opposed, to justify them on reason." N.L.R.B. v. George P. Pilling & Son Co., 3 Cir., 1941, 119 F.2d 32, 37.

Applying these constructions to the conditions imposed on the plaintiff before it

is entitled to injunctive relief, I am unable to say that it has made every reasonable effort to settle this dispute by negotiation. The salient facts. which support this conclusion follow.

1. On October 25, 1945, the union advanced several reasons to support its demand for a wage increase. Some of these reasons were supported by statistical data. The company's response was that it did not agree with these reasons. I am unable to find from the evidence that any arguments were advanced by the company representatives as to why these reasons could not or should not be considered as factors in the negotiations, with the exception of one argument advanced by the union, namely, the company's ability to pay wherein the company representatives pointed out why this should not be the basis for wage increase negotiations. Instead, its position was that in no event did it intend to grant an increase without a permissible increase in prices. At that meeting, the company representatives said they would supply the union with certain data in about three weeks to support their position. The company's representatives have never fulfilled that promise.

2. On December 21, 1945, the plaintiff company made a counter proposal to the union of a 10% wage increase at a meeting of company and union representatives. The company's proposal was made by Mr. Spicer, Vice-President of General Electric. While this proposal was being made to the union, Mr. Wilson, the President of the Company, at a press conference was announcing this counter proposal and giving extensive reasons and data to support the company's position. These reasons and data were not furnished to the union representatives at the conference attended by Mr. Spicer so that they might have been discussed with a view to settling the dispute. It is an obvious inference that the company, instead of attempting to convince the union by these reasons, chose to handle its release to the press in such a way as to gain public support of its position.

3. At the same conference that the plaintiff's counter proposal was made on December 21, the company chose to terminate its collective bargaining contract with the union. It is true that the contract contained a clause that it might be cancelled by either party on 90 days' notice. It is equally a fact that the termination letter stated that the company expected to undertake negotiations with the union for a new contract. The plaintiff, of course, had a legal right to cancel its contract with the union. But can it be said that such termination on the very day it made its counter wage proposal is consonant with the requirement on its part to make every reasonable effort to settle the dispute?

4. On December 26, a mediation meeting was scheduled with the Department of Labor officials. The union appeared at the meeting. The company did not appear and it offered no excuse at the hearing for its non-appearance, albeit it had been meeting with union representatives and government mediators since then in connection with this dispute.

The plaintiff's representatives at the conference table seemed to have adopted the attitude that they need not discuss the issue on the basis of any arguments except those they chose to advance; and that they were not required to rebut by counter arguments or data any arguments advanced by the other party to the negotiations. This attitude and the above numerated facts together with the other testimony brought out at the hearing on this phase of the case, leads me to reach the conclusion that the plaintiff failed to make every reasonable effort to settle this dispute.

In construing section 8 of the Norris-LaGuardia Act making it incumbent on the employer to make every reasonable effort to settle the dispute, the Supreme Court in Brotherhood of Railroad Trainmen v. Toledo P. & W. R. Co. 321 U.S. 50, 64 S.Ct. 413, 418, 88 L.Ed. 534, 150 A.L.R. 810, said:

"Representative O'Connor, supporting the sponsor's view, characterized section 8 as 'the "clean hands" provision' and said:

" 'That section provides that a complainant shall not be entitled to an injunction if he has not complied with any contract or obligation on his part or has not made every reasonable effort to settle the dis-

pute by the available methods of arbitration or mediation. Surely, this fundamental principle of equity that "he who seeks justice must do justice" should apply in labor disputes as well as in other judicial controversies.'"

The Supreme Court in that case pointed out that one who failed to comply with this requirement was not subject to liability by a legal means on account of such failure. The court however had this to say in that connection: "But if it (complainant) refuses, it loses the legal right to have an injunction issued by a federal court or, to put the matter more accurately, it fails to perfect the right to such relief. * * * True, this deprives respondent of a protection to which it might have been entitled if the condition had not been imposed. But that is true of each of the section's conditions. And it is hardly more true with respect to one condition than with respect to others. Mediation, or for that matter negotiation, does not become compulsory because without them or either of them injunctive relief cannot be had * * * nor does it follow * * * that it is left without remedy. Other means of protection remain."

▮ In deciding this case, I have in mind what other judges have said about the power of the courts to issue injunctions in cases of this kind and with particular reference to this condition laid down in the Norris-LaGuardia Act. I refer specifically to the following statement in Donnelly Garment Co. v. Dubinsky, D.C., 55 F.Supp. 587, 603:

"In conclusion, the Court should state that, under the Norris-LaGuardia Act, strict compliance with its purposes and conditions precedent is unquestionably mandatory.

" 'The fact must not be lost sight of, that however narrow the scope of injunctive relief may be in form, the issuance of the writ for any purpose in a labor dispute will generally tip the scales of the controversy. Plainly this was the very evil against which the Norris-LaGuardia Act was basically directed. In effectuating the purpose of the Act, therefore, the exceptions which have been left open to injunctive process may not be treated lightly, or as if the Act had never been passed, but should be viewed restrainedly, as a narrow field of permissive jurisdiction, exercisable in the interest of a public policy co-ordinate with that aspect upon which the prohibitions of the statute rest.' International Ass'n of Bridge, etc., Workers v. Pauly Jail Bldg. Co., 8 Cir., 118 F.2d 615, 616.

"Injunctions should not be granted merely because no demonstrable harm will result to the defendants by their issuance or to establish that past wrongs may have occurred. It is an extraordinary remedy which should only be granted with caution in view of the restricted jurisdiction of this Court."

Except for the failure on the part of the plaintiff to meet the conditions laid down in Section 8 of the Norris-LaGuardia Act, temporary injunctions would be granted in these cases. The other necessary facts have been proven. Standing alone, they unquestionably warrant the court to grant the relief sought by the plaintiff. By not granting these injunctions, the court does not condone the conduct of the defendants at the picket line as described. However, Congress, by enacting Section 8, set up a condition precedent to equitable relief that cannot be disregarded no matter how compelling the other facts are which call for the granting of such relief. This barrier to an injunction has not been overcome by the plaintiff as has been pointed out in the foregoing paragraphs. For that reason the applications for temporary injunctions are denied.