NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

COMMUNITY MOTOR BUS COMPANY,
Inc., Respondent.

No. 15049.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 1, 1971.

Decided March 22, 1971.

Joseph E. Mayer, Asst. General Counsel (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Warren M. Davison, Deputy Asst. Gen. Counsel, and Baruch A. Fellner, Washington, D. C., Attorney, on the brief), for petitioner.

M. R. Broudy, Norfolk, Va. (Broudy & Broudy, Norfolk, Va., on the brief), for respondent.

Before BRYAN, CRAVEN, and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

On the first day of an economic strike against Community Motor Bus Compa-

ny, some members of the union (Division 1177, Amalgamated Transit Union, AFL-CIO), engaged in mass picketing at the company's terminal. After the strike was settled and a new collective bargaining agreement signed, the company refused to reinstate 12 of the pickets. Six were belatedly reinstated with loss of seniority. All 18 presented grievances and called for arbitration under the new agreement, but the company refused, claiming it had reserved the right to screen the pickets to determine which had forfeited their right to reinstatement on account of picket line misconduct. The National Labor Relations Board held that the company committed unfair labor practices by denying full reinstatement to the strikers and by refusing to process their grievances.[1] We hold that the 18 employees forfeited their rights to reinstatement and that the dispute was not subject to arbitration. Consequently, we deny enforcement.

## I.

Upon the expiration of their collective bargaining agreement on September 30, 1968, the union and the company entered into negotiations. When talks broke down, some of the unit employees struck and began picketing the employer's premises on October 28. About 24 pickets, including the 18 whose discharge or loss of seniority is the subject of this action, blocked the gates of the terminal, preventing buses from leaving on their scheduled runs and shutting off access by non-striking employees. Following instructions, 20 pickets marched in an elliptical pattern three or four feet apart in front of the main gate.

When the first bus tried to leave, the picket line did not break and, after some jockeying back and forth, the bus backed off. After several more unsuccessful attempts by non-striking drivers to leave on their scheduled runs, the company called the police. Under police escort, nine or ten buses left the terminal. By admission of Walter J. Bierwagen, a member of the executive board of the international, after the first police escort left, the strikers reverted to the same style of picketing. "We continued to picket until the part-time school bus drivers attempted to leave the property. They could not break our picket line. Subsequently they were again escorted out by police."

Later that afternoon the pickets were instructed by union leaders to reduce their number and not to block access to the terminal. The same afternoon, the company obtained an order against the union restraining them from interfering with ingress to and egress from the bus terminal. There was no other mass picketing or picket line misconduct for the duration of the strike.[2]

The Board ruled that the company's refusal to reemploy 12 of the strikers, its delay in rehiring the other six, and denial of seniority rights to them violated § 8(a) (3) and (1) of the Act [29 U.S.C. § 158(a) (3) and (1)]. It ordered the company to reinstate all 18 employees with full seniority rights and back pay. We decline to enforce these provisions of the Board's order because the mass picketing that blocked access to the work site exceeded the permissible scope of economic strike activity and relieved the company of the obligation to rehire the strikers.

The pickets were not engaged in trivial acts of misconduct, but were interfering with a basic right guaranteed by statute—the right of non-striking employees to continue working. The right to strike, guaranteed by § 7 of the Act, is the most powerful weapon of or-

---

1. Community Motor Bus Co., 180 NLRB No. 105, 73 LRRM 1223 (1970).

2. The company charged that 12 of the employees engaged in misconduct along bus routes, but the trial examiner rejected the company's proof, and we accept his resolution of credibility. In addition to the mass picketing, the strikers engaged in other activity, such as name-calling and fist-shaking, which the trial examiner properly considered not serious.

ganized labor, but § 7 also imposes a duty on strikers not to interfere with the right of other employees to refrain from concerted activities. Oneita Knitting Mills v. NLRB, 375 F.2d 385 (4th Cir. 1967), holds that blocking free access to the plant violates this right and is grounds for denying reinstatement. The facts of this case present a stronger argument for denial of reinstatement than in *Oneita*. There the strike had been precipitated by the unfair labor practices of the employer. The court held the strikers to a less stringent standard of conduct than that of economic strikers, applying the balancing test of NLRB v. Thayer Co., 213 F.2d 748, (1st Cir.), cert. denied, 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954). The distinction between economic strikers and unfair labor practice strikers disposes of most of the cases cited by the Board where picket line misconduct was held not to forfeit reinstatement rights.[3] Since the picket line misconduct in *Oneita* forfeited the reinstatement rights of unfair labor practice strikers, similar conduct by economic strikers in this case is to be at least as strongly condemned.

The Board also relies on Terry Coach Industries, Inc., 166 NLRB 560 (1967), enf'd, 411 F.2d 612 (9th Cir. 1969), which ordered reinstatement of an economic striker. There the employee blocked a truck for a short time, stopped a lunch truck for a few minutes, told the driver not to come back, and used profane language. The trial examiner, ruling that this conduct did not forfeit the protection of the Act, described it as a rough trivial incident.

Here, in contrast, the mass picketing that blocked the company's gate was organized and persistent. It does not significantly differ from the conduct that *Oneita* condemned. Accordingly, we conclude the company was not obligated to reinstate the participants.

3. E. g., NLRB v. Buitoni Foods Corp., 298 F.2d 169 (3d Cir. 1962); NLRB v. Puerto Rico Rayon Mills, Inc., 293 F.2d

## II.

The Board also ruled that even if the strikers engaged in illegal picketing, the company on two occasions nevertheless condoned their activity, and therefore, it could not refuse reinstatement. On November 1, the first payday after the strike began, the company issued paychecks reflecting deductions for the full amount each striking employee owed the company for his uniform. This was contrary to the regular practice of deducting $3.00 a week for uniforms, prompting union officials to inquire whether the men were being fired. The company's superintendent said they were not fired, that the company wanted all the strikers back, but that he was afraid some of the employees might leave without having reimbursed the company for their uniforms. The union refused to accept this explanation. Fearing that an already tense confrontation might deteriorate into violence, the union and the company agreed to call in a representative from the State Labor Commission. After discussing the situation with him, the company agreed to deduct only the usual $3.00.

Since the superintendent, knowing about the illegal picketing, expressed his hope that all the strikers would return, the Board infers that the company intended to condone the picketing. We find the inference unwarranted. The paycheck incident took place only a few days after the strike began and emotions were dangerously high. It was only after long discussion with a neutral party that the company decided not to deduct the full amount owed for uniforms, and, even then, the decision was made primarily to keep the peace. The superintendent's reassurances that the men were needed and wanted back on the job falls short of condonation. The evidence does not establish a clear showing of an attitude of forgiveness and a willingness to "wipe the slate

941 (1st Cir. 1961); Stewart Hog Ring Co., 131 NLRB 310 (1961).

clean." See Kohler Co., 128 NLRB 1062, 1105 (1960), enf'd in part and remanded sub nom. Local 833, UAW-AFL-CIO, International Union United Automobile, Aircraft, and Agricultural Implement Workers of America v. NLRB, 112 U.S. App.D.C. 107, 300 F.2d 699, cert. denied, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962); Plasti-Line, Inc. v. NLRB, 278 F.2d 482, 486 (6th Cir. 1960); NLRB v. Marshall Car Wheel & Foundry Co., 218 F.2d 409, 414 (5th Cir. 1955). Even assuming that the superintendent's statements could be construed as an unequivocal invitation to the strikers to return to work regardless of their picket line misconduct, the invitation was rejected. The men continued to strike for another week. In such a case, a spurned offer, which is never renewed, does not forever waive the employer's right to refuse reinstatement for cause. Packers Hide Ass'n v. NLRB, 360 F.2d 59 (8th Cir. 1966).

The Board's second reason for holding that the company condoned the mass picketing was the company's reinstatement of six of the drivers. Edgar A. Tugman, the company's labor consultant, drew a distinction between those he believed to have engaged in deliberate illegal picket line activity and those who had been innocently involved. He, therefore, recommended that the company should reemploy six of the pickets and that it should deny reinstatement to 12. The company reemployed the six men early in December. It did not accord them seniority, though it did not rule out reconsidering this at a later date when it believed the impact on non-striking employees might be less.

The Board determined on the basis of credibility that the company had not proved misconduct attributed to 12 of the strikers along the bus routes. It also found that all 18 employees participated in the mass picketing that blocked the gates of the terminal. It concluded that the company by reinstating six of the employees had condoned the illegal picket line activity, and, therefore, it ordered reinstatement of all 18 employees with full seniority and back pay.

Although we accept as supported by substantial evidence the Board's findings concerning the conduct of the 18 employees, we believe its conclusion overlooks the distinction drawn by NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 259, 59 S.Ct. 490, 83 L.Ed. 627 (1939), between what an employer may do and what it must do. In *Fansteel*, the Court held illegal strike activity absolved the employer of any duty to reemploy, but the company "was nevertheless free to consider the exigencies of its business and to offer reemployment if it chose. In so doing it was simply exercising its normal right to select its employees." 306 U.S. at 259, 59 S.Ct. at 498.

 The same is true here. The company was free to discharge or rehire any or all of the strikers whose misconduct forfeited reinstatement rights. Any other rule, especially in the absence of anti-union animus, would confront the employer with an all-or-none rehiring choice, which is not required by the Act or by the doctrine of condonation. Kohler Co., 128 NLRB 1062, 1105 (1960), enf'd in part and remanded sub nom. Local 833, UAW-AFL-CIO, International Union, United Automobile, Aircraft, and Agricultural Implement Workers of America v. NLRB, 112 U.S.App.D.C. 107, 300 F.2d 699, cert. denied, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962).

The Board's reliance on NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964), is misplaced. There the employer was required to reinstate employees who it mistakenly believed had engaged in unprotected activities. Here, in contrast, it is undisputed that all 18 employees repeatedly engaged in illegal picketing that was planned and organized by union leaders.

 Because the hearing established that the six reemployed strikers had engaged in illegal picket line activities, the company was justified in treating them

as new employees. Cf. NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 259, 59 S.Ct. 490, 83 L.Ed. 627 (1939). Cases on which the Board relies for authority that returning strikers may not be denied seniority dealt with strikers who had not engaged in illegal activity.[4] Because of this factual difference they are not applicable.

### III.

At a bargaining session on November 8, the union asked the company if its last contract proposal made nearly a month earlier stood firm. The company replied that the offer remained open, but that the company reserved the right to refuse to hire employees who were guilty of illegal picket line activity. The company declined to state at the meeting which employees it would bar. Instead, Tugman, the company's labor consultant, said that he would screen the employees to determine whether they were entitled to come back.

The union called a membership meeting to vote on the company's last offer. Bierwagen, a union official, testified at the NLRB hearing: "I informed the members as to the nature of the offer, that it was firm, that the company, that Mr. Tugman stated that he was going to reserve the right to screen the people and that we had no idea whether he meant one or two or all. Also that when they vote, they should keep this in consideration." At this point, the membership could have voted down the company's proposal because of the objectionable reservation attached to it. Instead they accepted it.

Bierwagen then informed the company "that the men had voted to return to work on the basis of the company's last offer and without any other stipulations or conditions." Whatever conditions Bierwagen may have had in mind, his statement cannot be considered a rejection of Tugman's right to screen, in light of the employees' vote with that very issue impressed upon them.

Finally, at a meeting two days later when the contract was signed, the company again reiterated its refusal to reemploy the strikers until they had been screened for illegal activity. The president of the local union, recounting Tugman's statement at the meeting, testified:

"That he [Tugman] would take it as his right to do some screening on who would return due to the illegal strike activity at the time. There was nothing in the contract in regard to it. I asked him for a memorandum or names that were involved. He said: 'I will do the screening or some individual will get hurt that is not supposed to get hurt.'

"I made it known that if he was going to do the screening it would be done by seniority as the men returned to work on the job."

It is clear, then, that the company's reservation of a right to screen the strikers for illegal conduct was fully understood by the union members when they voted on the contract and by the union officials when they signed the contract. The record is devoid of evidence that the company ever relinquished that right or that any term of the collective bargaining agreement was intended to apply to the reinstatement issue.

Several days after the collective bargaining agreement was signed, the superintendent told 18 of the drivers they could not come back until they were recalled. All 18 filed grievances under provisions of the new collective bargaining agreement that included a clause for binding arbitration "in the settlement of any disagreement or dispute concerning any matter arising under this Agreement." In a letter to the union, Tugman replied that the grievances could not be processed under the new contract because the employees participated in al-

---

4. NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); NLRB v. Hilton Mobile Homes, 387 F.2d 7, 11 (8th Cir. 1967); NLRB v. California Date Growers Ass'n, 259 F. 2d 587, 589 (9th Cir. 1958).

legedly improper picket line activity during a period when there was no contract between the union and the company. The union then proposed to arbitrate the question of the arbitrability of the grievances. Tugman did not reply, but later the company recalled six of the men.

■ The trial examiner found that the company's refusal to process the grievances violated §§ 8(a) (5) and (1) of the Act.[5] His conclusion, adopted by the Board, is premised on a finding that the grievance was a dispute arising under the new collective bargaining agreement. We agree that the dispute over reinstatement arose at a time when the new collective bargaining agreement was in force, even though the challenged conduct took place when the parties had no agreement. Boeing v. International Ass'n of Machinists, 381 F.2d 119 (5th Cir. 1967). However, because of the company's express reservation of the right to screen returning employees, we find that the company had no duty to process grievances on that matter.

■■ The obligation to arbitrate is founded on contract, and in the absence of agreement neither party can be compelled to submit a dispute to arbitration. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962). In construing the agreement, doubts must be resolved in favor of arbitration. United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Thus, the parties must arbitrate "all matters, not explicitly excluded, that reasonably fit within the language used." United Textile Workers of America, AFL–CIO, Local Union No. 120 v. New-

berry Mills, Inc., 315 F.2d 217, 219 (4th Cir.), cert. denied, 375 U.S. 818, 84 S.Ct. 54, 11 L.Ed.2d 53 (1963).

Here the contract is completely silent on reinstatement, while the company's position was known and considered by the union membership. It is clear that the terms on which the parties settled the strike did not include arbitration of disputes over the reinstatement of pickets. Consequently, the company did not breach an agreement to arbitrate and its refusal was not an unfair labor practice. Cf. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962).

Enforcement denied.

5. Ordinarily, the scope of grievance and arbitration clauses in collective bargaining agreements is litigated in actions brought under § 301 of the Labor Management Relations Act [29 U.S.C. § 185]. However, the Board, the union, and the company proceeded on the assumption that refusal to process grievances pursuant to a collective bargaining agreement can also be a violation of §§ 8(a) (5) and (1) of the Act [29 U.S.C. §§ 158(a) (5) and

(1)]. We, in turn, without deciding the issue will adopt the position of all the parties for the purposes of this case. Compare NLRB v. Orkin Exterminating Co., 379 F.2d 972 (5th Cir. 1967), and NLRB v. Ogle Protection Services, Inc., 375 F.2d 497, 500–501 (6th Cir.), cert. denied, 389 U.S. 843, 88 S.Ct. 84, 19 L. Ed.2d 108 (1967), with Amalgamated Clothing Workers v. NLRB, 120 U.S. App.D.C. 47, 343 F.2d 329 (1965).