Cratsley, Hamlin, Brassard, Js.
This is an action for injunctive relief pursuant to G.L.c. 214, §6 which governs injunctions “in any case growing out of or involving a labor dispute.” Pursuant to G.L.c. 212, §30, the Chief Justice appointed and convened a panel of three justices of the Superior Court to hear this matter. On May 8, 1995, the court held a hearing as required by G.L.c. 214, §6.
Plaintiffs, Eastern Middlesex Press Publications, Inc. and Malden Publications, Inc. d/b/a The Daily News-Mercury (The Daily News), publish a daily newspaper serving the Malden, Medford, Melrose and Som-erville communities. The Daily News’ place of business is located at 111 Commercial Street, Malden, Massachusetts. Defendant, Boston Typographical Union No. 13 (BTU), is a member of the Printing, Publishing and Media Sector, Communications Workers of America. BTU represents 11 former employees of The Daily News who worked primarily as typesetters. Defendant, Henry Vitale, is the President and Business Agent of the BTU and defendant, John MacDonald, is a member of the BTU and former employee of The Daily News. On November 10, 1994, after labor negotiations broke down, The Daily News terminated 11 BTU employees. On November 14, 1994, the BTU members including the 11 terminated employees began to picket The Daily News' premises and continued to do so on a daily basis until April 27, 1995.[3]
On April 19, 1995, The Daily News filed this action which included a request for a temporary restraining order. This court (White, J.) entered a temporary restraining order on April 27, 1995 enjoining the defendants from interfering with or blocking the access to plaintiffs’ properly as well as other alleged picket line misconduct. Judge White dissolved the temporary restraining order on May 1, 1995 and referred the case to the Chief Justice to schedule a hearing before a three-judge panel pursuant to G.L.c. 212, §30.
In its verified complaint, The Daily News alleges that since November 14,1994, the BTU members, with the knowledge and approval of the BTU, have unlawfully interfered with or blocked access to plaintiffs’ property. Defendants allegedly picket in the driveway to plaintiffs’ property thereby blocking or delaying entrance by non-striking employees, delivery vendors and customers. The Daily News further alleges that defendants have unlawfully interfered with non-striking employees’ rights secured under §7 of the National Labor Relations Act (29 U.S.C. §157), by cursing and threatening such employees as they enter or exit plaintiffs’ property. The Daily News seeks injunctive relief not to prevent picketing altogether, but, rather, to prohibit the picketers from blocking the entrances and exits to plaintiffs’ property. The Daily News claims that the circumstances of this case satisfy the requirements set forth in G.L.c. 214, §6 and that injunctive relief is required to prevent future unlawful picketing-related incidents from occurring.
FINDINGS OF FACT
Upon consideration of the evidence presented at the hearing by ten witnesses and nine exhibits, the court makes the following findings of fact.
Labor negotiations between The Daily News and the BTU broke down on November 10, 1994. Prior to that date, the parties had been involved in on-going collective bargaining negotiations. The Daily News has been *45 and continues to be in a precarious financial position. In 1991, The Daily News filed a bankruptcy petition under Chapter 11. During this bankruptcy proceeding, the parties apparently reached a modification to their collective bargaining agreement. This modification ended, however, when The Daily News withdrew its bankruptcy petition in November, 1994 in order to avoid Chapter 7 proceedings.
The parties held two further negotiating sessions. On November 2, 1994, The Daily News proposed to eliminate the BTU employees’ positions and, in turn, to begin contributing toward a delinquent pension plan that would then be paid out to employees over a period of years. During a second meeting on November 10, 1994, Henry Vitale, BTU president and business agent, rejected The Daily News' proposal and offered a counter-proposal which provided for incentive buyouts in order to reduce the workforce. The Daily News immediately rejected the counter-proposal and terminated 11 employees that day in accordance with its last proposal.
On the same day, Vitale suggested submitting the dispute to mediation but The Daily News refused to participate. The BTU thereafter filed unfair labor charges against The Daily News with the National Labor Relations Board (NLRB). In December, 1994, the Regional Director of the NLRB dismissed the BTU’s complaint and ruled that The Daily News had bargained in good faith, reached a bona fide impasse, and lawfully implemented its last proposal. The NLRB, recently, on May 22, 1995, reversed the Regional Director’s dismissal of the union’s unfair labor charges against The Daily News and remanded the case back to the Regional Director for issuance of a complaint. The NLRB held that The Daily News’ “conduct raised issues under §8(a)(5) of the NLRA (29 U.S.C. §158(a)(5)) which warranted NLRB determination based on a record developed before an administrative law judge.”
Presently, The Daily News employs 16 people. These employees have chosen to cross picket line.
On November 14, 1994, the terminated employees, with the knowledge of the BTU, began picketing the plaintiffs premises. Since that day, the picketers have picketed every weekday from approximately 7:00 a.m. to 4:00 p.m. Vitale has been present at the picket line on occasion throughout the six months that the BTU has picketed The Daily News. The BTU employees were joined on the picket line by sympathizers and other unions. Anywhere between two to 25 people could be picketing on any given day, although the union members testified they sent six pickets in the morning and six in the afternoon. The picketing generally occurred on the Commercial Street side of plaintiffs’ property. Picketers carrying placards would walk along the sidewalk and cross over plaintiffs’ driveway. The BTU picketers picketed in this manner from November 14, 1994 until enjoined by this court’s order of April 27, 1995. As of April 27, 1995, the picketers have discontinued picketing across the plaintiffs driveway. There is 200 feet of sidewalk on Commercial Street on which the picketers can publicize their dispute.
Once the picketing began, The Daily News contacted Neil Buckley, Malden Chief of Police, to obtain police assistance with respect to the picketing. Chief Buckley dispatched a police detail to plaintiffs’ premises. Chief Buckley instructed the officers to stay neutral and to open the picket line to permit vehicles to enter and exit the premises in no less than 30 seconds.
During the six months of picketing, the police neither made any arrests nor issued any citations for damage to plaintiffs’ property or any other violation of law. Chief Buckley has not disciplined any officer who has refused to work at the picket line. Chief Buckley stated that the Malden police force is unionized and involved in its own labor dispute with the city. Chief Buckley testified that only 15 out of 100 Malden police officers had been willing to work the detail at The Daily News and that he questions whether he will be able to get any officers to work if an injunction does not issue.
The Daily News has paid $2,000 per week for the police detail expending a total to date of about $60,000 for police protection. Two police officers were stationed at the picket line until February 1995. At that time, the number of police officers was reduced to one because The Daily News, facing increasing financial constraints, could no longer afford to pay for two officers.
Since April 27, 1995, when the picketers discontinued crossing over the plaintiffs driveway, The Daily News has not had to maintain a police detail at its premises.
Non-striking employees, on average, were delayed three to five minutes before they were permitted to enter the premises because the picketers often blocked access to the driveway.[4] Additionally, the Daily New’s general manager, Robert Butler, on average, has been kept waiting two to three minutes before he could enter or exit the premises. Because Commercial Street is heavily travelled some employees feared that they would be rear-ended while they waited on Commercial Street for the picketers to finish picketing in the driveway.
The non-striking employees and the BTU employees stated that the period of delay before vehicles could enter or exit usually depended on which police officer was present. BTU employees testified that when a car approaches to enter or exit the premises, the picketers will walk in the driveway until the police officer directs them to disperse. The BTU employees all testified that the driveway picketing and resulting delay would take between 30 and 90 seconds.
Picket line epithets have been directed toward employees Arlene Rovner, Michelle Altongy and Michael *46 Mozzicato as they passed by the picketers on their way into work. The employees did not testify to any serious threats of physical harm. There have been broken glass, carpenter nails and tree branches seen in the parking lot and tree branches pulled across the driveway. The Daily News’ employees, however, have never seen any BTU picketers throw such debris into the driveway.
Because of the picketing, UPS and Federal Express have refused to make deliveries to the plant because their strict schedules will not permit them to wait to pass through the picketers. The Daily News arranged to have one of its customers who is located nearby accept deliveries for them. The Daily News then has employees go and pick up the packages. Although the delivery companies have stopped making deliveries, The Daily News has still been able to publish the newspaper every day. Furthermore, picketing has not caused a significant drop in the newspaper’s circulation.
RULINGS OF LAW
The anti-injunction statute, G.L.c. 214, §6, provides for injunctive relief in cases involving labor disputes in very limited circumstances. Before injunc-tive relief will be granted, pursuant to §6(1), the three-judge panel must find:
(a) that unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction . . . shall be issued on account of any threat or unlawful act excepting against the person or persons, association or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;
(b) that substantial and irreparable injury to the plaintiffs property will follow;
(c) that as to each item of relief granted greater injury will be inflicted upon the plaintiff by the denial of relief than will be inflicted upon the defendants by the granting of relief;
(d) that the plaintiff has no adequate remedy at law; and
(e) that the public officers charged with the duly to protect the plaintiffs property are unable or unwilling to furnish adequate protection.
Section 6(4) also requires that no restraining order shall issue to any plaintiff “who has failed to comply with any obligation imposed by law which is involved in the labor dispute ... or who has failed to make every reasonable effort to settle such dispute . . .” These requirements are “stated conjunctively” and “failure to find any one of them is fatal to injunctive relief.” Seekonk Family Drive-In Theatre Inc. v. Madino, 340 Mass. 425, 429 (1960).
The Massachusetts Anti-Injunction Act, G.L.c. 214, §6, is modelled after the Norris-LaGuardia Act, 29 U.S.C. §107. The purposes behind G.L.c. 214, §6 parallel those behind the federal statute. See Sanford v. Boston Edison Co., 316 Mass. 631, 638 (1944). The underlying purpose of the Norris-LaGuardia Act was to leave the resolution of labor disputes to negotiation, and to prevent “courts from upsetting the natural interplay of the competing economic forces of labor and capital.” Brotherhood of R. Trainmen v. Chicago, R.& I.R. Co., 353 U.S. 30, 40 (1950). Thus, Massachusetts’ little Norris-LaGuardia Act, G.L.c. 214, §6, severely limits the jurisdiction of courts to issue injunctions in labor disputes.
A. Unlawful Acts
The first hurdle The Daily News must overcome in order to be entitled to injunctive relief is a finding that the defendants have committed unlawful acts. The Daily News alleges that the defendants have interfered with the ingress and egress to the plant, thereby violating nonstriking employees’ rights to refrain from picketing, and impeding on the reasonable use of its property. Section 7 of the NLRA (29 U.S.C. §157)[5] guarantees a non-striking employee’s right to refrain from striking and continue working. See NLRB v. Community Motor Bus Co., 439 F.2d 965, 966 (4th Cir. 1971). Section 8(b) of the NLRA provides, in relevant part: “It shall be an unfair labor practice for a labor organization or its agents — (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title.” 29 U.S.C. §158(b)(l)(A). The test for coercion and intimidation is “whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act.” NLRB v. Service Employees Int'l Union, Local 254, 535 F.2d 1335, 1337 (1st Cir. 1976). Although there is no requirement of any actual violence or threats of violence, the words “restrain and coerce” in §8(b)(l)(A) intimate conduct which is “tinged with violence, duress, or reprisal.” NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639, 362 U.S. 274, 286 (1959).
The cases cited by The Daily News are consistent with this approach. NLRB v. Community Motor Bus Co., 439 F.2d 965, 966 (4th Cir. 1971), NLRB v. United Mine Workers of America 429 F.2d 141 (3d Cir. 1970), and United Parcel Service, Inc. v. Local 25, International Brotherhood of Teamsters, 421 F.Supp. 452 (D.Mass. 1976), all involved situations in which the picketers’ conduct was clearly coercive. UnitedMine Workers and United Parcel Service involved actual acts of violence and a situation where individuals were forced to “run a gauntlet” of a hostile and threatening crowd. In Community Motor Bus, the picketers’ obstruction of the entrance effectively “shut off’ access to the premises to non-striking employees.
Additionally, in Hartford Division Emhart Industries Inc. v. Amalgamated Local Union, 376, 461 A.2d 422 (Conn. 1983), although the picketing was not characterized by violence, the picketers’ conduct caused delays of up to two hours for those employees trying *47 to enter the premises. The picketing further caused traffic to tie up a number of blocks, impeding traffic on the adjoining streets. Id. The court held that this manner of picketing was unlawful. Id. at 434.
In the case at bar, the picketing at The Daily News’ premises has not been marred by acts of violence. The non-striking employees have indeed been temporarily delayed by the picketers on an average of 3-5 minutes each time they desired to enter or exit the premises. The picketers would often shout the typical picket line epithets at the non-striking employees as they passed by them. Boston Buffalo v. Express, Inc., 114 L.R.R.M. 2767, 2769 (Mass.Sup.Ct. Feb. 26, 1982). Moreover, the non-striking employees encountered debris in the driveway and parking lot, although the court cannot attribute such actions to the defendants.
The court finds that the defendants’ interference with the ingress and egress to The Daily News is serious, but is not so coercive and intimidating that it constitutes a violation of the §7 rights of non-striking employees. Contrast American Steel Foundries v. TriCity Council, 257 U.S. 184, 204 (1921).
Additionally, the picketers’ manner of blocking the entrance to The Daily News has not significantly interfered with its right to the reasonable use of its property. Contrast Hartford Division, supraat435.The picketing has caused UPS and Federal Express to stop making deliveries to The Daily News. The Daily News has made other arrangements to receive the supplies needed to produce the newspaper. While the picketing does indeed interfere with The Daily News' operations in this manner, it has not denied plaintiffs’ the reasonable use of their property.
The court notes that plaintiffs have presented a compelling argument. But this case, as all cases, rises and falls with the facts at hand. Had the delays been longer, or the police failed to clear the driveways, or the picketing characterized by violence, or more blatant acts of intimidation or coercion, the court would have had little difficulty ruling in plaintiffs’ favor. However, being mindful of the restrictive nature of the anti-injunction act, and that the burden is on the plaintiffs, this court concludes, that the picketers’ conduct to date is not unlawful.[6] United Parcel Service, supra at 458 (picketing characterized by concerted acts of violence is unlawful); Hartford Division, supra at 426, 434 (picketing which caused two-hour delays to enter or exit premises is unlawful); Service Employees, supra at 1337 (picketing which included photographing non-striking employees and taking down license plate numbers is calculated to intimidate and is unlawful under §8(b)(l)(A)).
B.Substantial and Irreparable Injury; Inadequate Remedy At Law
The Daily News must prove that it has suffered a substantial and irreparable injury to property and that it does not have an adequate remedy at law. G.L.c. 214, §6(b), (d). Under the Norris-Laguardia Act, after which G.L.c. 214, §6 is modeled, “property” includes not only tangible property but the right to use that property as well. Knapp-Monarch Co. v. Anderson, 7 F.Supp. 332 (D. Ill. 1934).
The issue is close in this case. While The Daily News has been harmed, it does not appear that The Daily News has suffered “substantial” harm as a result of the defendants’ activities. Although The Daily News has continued to publish the newspaper daily, there have been inconveniences. Specifically, Federal Express and UPS have stopped making deliveries to the plant and The Daily News must pick up its packages elsewhere. There is no evidence that the picketers have prevented The Daily News from delivering its newspapers, or of any loss of good will due to a degradation of service. Compare Boston-Buffalo, supra at 2769. Moreover, the picketing has not caused The Daily News to experience a significant drop in its newspaper’s circulation.
Although the non-striking employees have experienced 3-5 minute delays in entering the premises, there is no evidence that defendants prevented any employee from entering the premises altogether. The evidence does not show that the non-striking employees have been substantially impaired in the performance of their jobs. Compare Harford Division, supra at 426 (employees delayed for up to two hours).
Since the picketing began, The Daily News has made significant expenditures approximating $60,000 toward maintaining a police detail at the premises. This police detail appears necessary in order to keep obstruction to ingress and egress to a minimum. The court acknowledges that such a sum is a major expense, especially in light of The Daily News' precarious financial situation. Nevertheless, on balance, while the issue is close, plaintiffs have failed to demonstrate that the defendants’ conduct has caused them to suffer substantial and irreparable harm.
C.“Greater Injury” to The Daily News.
The Daily News must prove it will incur “greater injuiy” by the denial of relief than will be inflicted upon the defendants by the granting of relief. G.L.c. 214, §6(c). The plaintiffs do not seek to enjoin all picketing, rather, they seek only to prohibit the defendants from interfering with or blocking the ingress or egress to The Daily News. This requested relief will not damage the defendants. There is approximately 200 feet of sidewalk adjacent to plaintiffs’ property that the defendants can picket to adequately publicize their dispute. Conversely, if injunctive relief is not granted, the obstruction of access to The Daily News will continue to impede plaintiffs and its employees.
D.Police Protection
The Daily News must prove that public officers are “unable or unwilling to furnish adequate protection.” G.L.c. 214, §6(e). Upon the onset of picketing, a police *48 detail was dispatched to The Daily News to monitor picketers’ conduct. The police detail has been necessary, albeit expensive, to maintain the operation of plaintiffs’ business. Chief Buckley instructed the police officers to open the picket line in no less than 30 seconds upon a vehicle wishing to enter or exit the premises. The court finds that the average delay for some employees has been as long as 3-5 minutes and concludes that some police officers are not willing to follow Chief Buckley’s directive. Even the union witnesses said it could take a police officer up to 90 seconds to clear the driveway. Notwithstanding this failure to follow orders, however, The Daily News has been able to continue the operation of its plant. See Carter Constr. Co. v. Nischwitz, 111 F.2d 971, 977 (7th Cir. 1940) (this provision generally contemplates “protection” sufficient to allow the employer to continue working notwithstanding threats of violence); Wilson Co. v. Birel, 105 F.2d 948, 950 (3rd Cir. 1939).
Furthermore, while only 15 out of 100 police officers have been willing to work the police detail at The Daily News, this number is apparently sufficient to maintain adequate protection at plaintiffs’ premises. The court notes that Chief Buckley questions whether he can get any police officers to work at the picket line in the absence of an injunction. If such a result should occur and the premises are without adequate protection, plaintiffs may renew their motion and the court will reevaluate the request for injunctive relief. At this time, however, the court does not find that the police are unwilling or unable to provide adequate protection.
E. Reasonable Efforts to Settle the Dispute
The last prerequisite to injunctive relief is G.L.c. 214, §6(4), the “clean hands” provision. This section provides that no restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law or who has failed to make every reasonable effort to settle the labor dispute either by negotiation or with aid of any available governmental machinery of mediation or voluntary arbitration. G.L.c. 214, §6(4). This requirement means, among other things, that a good faith effort in negotiation must be made with a view to reaching a settlement if possible. General Electric v. Gojack, 68 F.Supp. 686, 689 (N.D. Ind. 1946).
The Daily News has primarily relied on the NLRB’s Regional Director’s December, 1994 decision as evidence of its good faith effort to settle the matter. The NLRB, however, recently overturned this decision on appeal. The NLRB held that The Daily News' conduct has raised issues which merit a full adjudicatory determination by the NLRB.
Aside from the Regional Director’s decision, the evidence is not clear that The Daily News made every reasonable effort to settle the matter or to avail itself of available governmental machinery of mediation or arbitration. The labor dispute between the parties involved economic issues, namely the best way to phase out the BTU employees. This type of dispute may be susceptible to settlement by negotiation, mediation or arbitration. Boston-Buffalo, supra at 2769. The evidence shows that The Daily News immediately rejected the BTU’s counter-proposal and terminated the 11 BTU employees. Additionally, The Daily News refused to mediate the dispute pursuant to BTU’s suggestion. Based on this evidence, the court finds that The Daily News has not satisfied its burden with respect to this last requirement.
CONCLUSION
Because the plaintiffs have not satisfied their burden with respect of each of the several requirements for injunctive relief, the court denies the requested relief. As a final note, the court acknowledges that this case presented close factual and legal issues. Based on the evidence, the panel is unable to conclude that injunctive relief is warranted at this time. Should the facts change, this panel will revisit the appropriateness of some measure of injunctive relief.
ORDER
Based on the foregoing findings of fact and rulings of law and pursuant to G.L.c. 214, §6, the Court hereby ORDERS that plaintiffs’ motion for a preliminary injunction is DENIED.

On April 27, 1995, The Daily News obtained a temporary restraining order enjoining the BTU and others from blocking or interfering with the ingress or egress to plaintiffs’ property and prohibiting certain other alleged unlawful and offensive picket line conduct. On May 1, 1995, the court (White, J.) dissolved this temporary restraining order. Picketing, however, has not resumed in the interim.

One employee, Michelle Altongy, has been kept waiting as long as 10 minutes. Altongy, a sales representative, is in and out of the premises during the day and was often delayed upon exiting the property.

Section 157 provides: “Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities.”

General Laws, c. 214, §6(l)(a) requires that an injunction issued only against persons, associations or organizations that commit unlawful acts, authorize the unlawful acts, or ratify the unlawful acts after actual knowledge thereof. General Laws, c. 149, §20B, which applies to this matter, requires “clear proof’ of participation, authorization or ratification by officers or members of the union. See Tosti v. Ayik, 394 Mass. 482, 487 (1985). With those principles in mind, although the court holds that the manner of picketing is not unlawful, the court, nonetheless, finds that the BTU and the individual defendants actually participated in or authorized the picketing. MacDonald has been at the picket line nearly everyday since picketing began. Vitale, BTU president and business agent has been at the picket line personally and presumably has observed the manner of picketing.