NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SERVICE EMPLOYEES INTERNATION-
AL UNION, LOCAL 254,
AFL–CIO, Respondent.

No. 75–1406.

United States Court of Appeals,
First Circuit.

Submitted March 5, 1976.

Decided May 21, 1976.

Elliott Moore, Deputy Associate Gen. Counsel, and John S. Irving, Jr., Gen. Counsel, Washington, D.C., on brief, for petitioner.

Michael J. Muse, and Muse & Muse, Boston, Mass., on brief, for respondent.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order directed against Service Employees International Union, Local 254, AFL–CIO (the Union) which represents the service and maintenance employees at the Massachusetts Institute of Technology (M.I.T.). The issues involved in this case arose from a strike called by the Union in connection with pending contract negotiations. The Board's order essentially requires the Union to cease and desist from certain activities that interfere with nonstriking employees of M.I.T.

The Board adopted the administrative law judge's findings of fact which are undisputed. The following events are those material to the Board's charges. The Union called a strike on September 12, 1974. On the morning of September 13, the assistant manager of Burton House, an M.I.T. dormitory, received a telephone call from Bea Santos, the dormitory housekeeper who was a union steward and a member of the negotiating committee. Mrs. Santos stated to the manager that he should tell Frank Rizzuto, the dormitory's maintenance man "to get out of the building." When the manager told her Rizzuto was not in the dormitory Santos replied "You tell him . . . to get out of the building. . . . Frank's in a lot of trouble and so are you. . . ." Later in the day Santos repeated a similar statement to the manager who later contacted Rizzuto and relayed the substance of Santos' remarks.

On the same day Mrs. Santos also called the manager of McGregor House, another M.I.T. dormitory, and told him that employee Ralph Delgenio was working in the building and that he should be required to leave. This demand was again conveyed to the manager when he later met Santos in the company of Union President Joseph Sullivan. The accusation was made that Delgenio was working in the dormitory; the manager denied this. Sullivan then said, "Yes, he is working in the building and if you don't get him out . . . there will be trouble, and if you don't get him out soon we'll come up there and get him out and somebody's liable to get hurt." This statement was not relayed to Delgenio.

As part of the strike the Union picketed various facilities at M.I.T. One of the picketed facilities was a laboratory located on the Hanscom Air Force Base in Lexington, Massachusetts. There are four different gates through which M.I.T. employees may enter the laboratory, but they primarily use gate three.[1] The Union began picketing this gate on September 13 at 7 a. m. when M.I.T. employees normally begin arriving for work. The picketing was under the direction of the Union's business agent Frederick Cadigan. The pickets walked across the gate entrance at intervals of 5 to 7 feet so that an automobile was unable to enter the gate unless the pickets made way for it. Although vehicles were permitted to enter, the pickets "impeded ingress into the base." The Lexington police arrived and thereafter picketing at gate three was kept to the sides of the road, out of the way of entering and departing vehicles. When a state court restraining order enjoined police interference with the picketing on September 17, the pickets resumed patrolling across the entrance gate as before, and as a result a major traffic jam developed at gate three, blocking the entrance of vehicles. M.I.T. then closed this gate for the remainder of the strike.

On September 19 the Union formed groups of 15 or 16 pickets on each side of

---

1. Gate three is manned by security guards employed by M.I.T. while the other gates are manned by Air Force police.

the road leading to gate four of the Air Base which M.I.T. employees were then using. As automobiles turned into the gate one group of pickets would walk across the entrance way, causing vehicles to stop. A second group would then seek out the vehicle of an M.I.T. employee (distinguishable by a decal attached to its front license plate), and stand in front of it. "While the car was at a standstill Joseph Holland, a Union steward and a member of the Union's negotiating committee, walked in front of the vehicle and appeared to take a photograph of . . . [it]. As Holland was doing this, another picket appeared to be writing down the license plate number of the vehicle."

On September 20 a graduate student and research assistant,[2] accompanied by two other students sought to exchange containers of liquid gas at the Institute's Cryogenic Engineering Laboratory. To enter the facility they had to push the dolly on which the gas containers were carried around some wooden two-by-fours which were lying in the roadway (since the dolly could not roll over the boards). When they sought to leave they were forced to come to a stop because the lumber had been pushed together to completely block the road. At first the pickets explained why the students should not cross the picket line. Thereafter some of the pickets made statements such as "We'll crack your head" and "Wait until the strike is over. We'll take care of you then." After ten minutes the three were permitted to proceed.

The only incident of actual violence during the approximately month-long strike occurred on the afternoon of September 19. Allan Goldberg, an M.I.T. graduate student and research assistant, was driving from the loading dock of the student center. When he stopped at a crosswalk one of the three or four pickets present jumped in front of his car. The picket, Michael Falsetter, went to the driver's window of the car, accused Goldberg of trying to run him

down and punched the student on the jaw, knocking his glasses off.

The Board concluded that the Union had violated § 8(b)(1)(A) of the National Labor Relations Act (the Act) by "blocking automobiles in which nonstriking employees [were] riding," "by mass presence of pickets preventing or impeding M.I.T. employees from entering or leaving," and "by photographing employees seeking to cross the picket line." There is more than ample evidence to support these conclusions. On September 17 the pickets walked so closely spaced in front of gate three that cars could not pass freely, resulting in a traffic tie-up. Such activity could properly be found an interference with the rights of nonstriking employees under the Act. *See Local 542, Int'l Union of Operating Engineers v. NLRB,* 328 F.2d 850, 852 (3d Cir.), *cert. denied,* 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964). On September 19 pickets stepped in front of cars, detaining them while nonstriking employees were apparently photographed by Holland, a member of the Union's strike committee. Photographing of nonstrikers has been found by the Board to be "calculated to instill in [employees'] mind[s] a fear of retribution, because of [their] refusal to join the strike," *Dover Corp., Norris Division,* 211 N.L.R.B. No. 98, 86 LRRM 1607, 1611 (1974); *cf. Larand Leisurelies, Inc. v. NLRB,* 523 F.2d 814, 819 (6th Cir.1975), particularly when coupled with other conduct such as the pickets' actions here in blocking certain vehicles and appearing to take down license plate numbers.

The Union claims that the conduct cited by the Board was not unlawful because no nonstriking employees were shown to have been actually coerced. However, this claim cannot prevail. The test of coercion and intimidation "is not whether the misconduct proves effective" but "whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the

---

2. Graduate students who serve as research assistants are, in the latter role, salaried employees of M.I.T.

exercise of rights protected under the Act." *Local 542, Operating Engineers v. NLRB, supra* at 852–53. *See NLRB v. United Mine Workers of America,* 429 F.2d 141, 146 (3d Cir.1970).

■ The Board also found that the Union had violated the Act by "placing wooden obstructions in the road." There was substantial evidence to support this conclusion. The placement of two-by-fours in the roadway effectively blocked the transfer of liquid gases from the Institute's Cryogenic Engineering Laboratory and could be considered an integral part of the method selected by the Union for picketing at that installation. Moreover, the establishment of this "barricade" was not the spontaneous act of an individual picket and the Union was properly held responsible for the conduct. *See NLRB v. Bulletin Co.,* 443 F.2d 863, 867 (3d Cir.1971), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972).

■ We likewise find substantial evidence to support the Board's conclusion that the Union was involved in "threatening to inflict bodily harm" upon nonstriking M.I.T. employees. The Union can clearly be held responsible for the threat made by its steward, Mrs. Santos, *see Local 761, Int'l Union of Electrical, Radio, and Machine Workers, AFL–CIO and General Electric Co.,* 126 N.L.R.B. No. 25, 45 LRRM 1278 (1960), as well as the threat made by its president that Union representatives would go into McGregor House to get employee Ralph Delgenio and that "somebody's liable to get hurt." While Delgenio was not present when this threat was made, the Board could "reasonably infer" Sullivan's threat was likely to be communicated to Delgenio by his supervisor, as a similar threat made by Mrs. Santos had been relayed to another employee under virtually identical circumstances at about the same time. *Cf. Food Store Employees Union, Local 347 v.*

*NLRB,* 135 U.S.App.D.C. 341, 418 F.2d 1177, 1181 (1969).

■ The Board's finding to the effect that the Union was involved in "physically assaulting" M.I.T. employees who did not honor the Union's picket line is based upon the incident on September 19 where a picket (Falsetter) punched Allan Goldberg. The administrative law judge found the Union responsible for this action because the picket who threw the punch was wearing an armband which read "Local 254 on strike" and because the misconduct took place in the vicinity of a picket line authorized by the Union. As noted earlier, however, this incident which occurred within the first week of picketing was the only instance of actual violence during the approximately month-long strike. According to uncontradicted testimony most of the Union picketing sites involved on the average between eight and fifteen picketers, with Union officers or members of the strike committee present. No violence occurred at these sites even while vehicles were being blocked and traffic tied up. The site where the incident occurred had only three or possibly four picketers (the complaining witness was uncertain), and no Union officials were present. There was no recurrence, nor anything indicating Union acquiescence in or approbation of the assault. We do not think this isolated act, in the absence of subsequent Union conduct that might constitute acquiescence or approbation, *see NLRB v. Bulletin Co., supra* at 867; *National Cash Register Co. v. NLRB,* 466 F.2d 945, 961 (6th Cir.1972), *cert. denied,* 410 U.S. 966, 93 S.Ct. 1442, 35 L.Ed.2d 700 (1973), is sufficient to attribute this unlawful conduct to the Union.[3] "An act of violence by a participant in a strike may not be imputed to . . . the union in the absence of a showing of agency, ratification, counselling, incitement, or other form of participation in the act of violence by . . . the union."

---

**3.** Board member Fanning voted "not [to] adopt the Administrative Law Judge's finding that [the Union] violated Sec. 8(b)(1)(A) of the Act by the action of Falsetter, a picket striking Goldberg" because he felt "the evidence [was] insufficient to establish that Falsetter was an

agent of [the Union], or that [the Union] authorized or condoned such activity." *Service Employees Int'l Union, Local 254, AFL–CIO and Massachusetts Institute of Technology,* 218 N.L.R.B. No. 215, n. 1, 89 LRRM 1783 (1975).

*NLRB v. Sea-Land Service, Inc.,* 356 F.2d 955, 966 (1st Cir.), *cert. denied,* 385 U.S. 900, 87 S.Ct. 205, 17 L.Ed.2d 131 (1966). *See NLRB v. Cambria Clay Products Co.,* 215 F.2d 48, 52–53 (6th Cir.1954); *NLRB v. Lambert,* 211 F.2d 91, 94–95 (5th Cir.1954). Under the circumstances of this case we do not find the Board's attribution of the incident of physical assault to the Union to be supported by substantial evidence. The phrase in Paragraph 1(b) of the Board's order which refers to "physically assaulting" is therefore stricken, and the order as so modified is enforced.

*So ordered.*