NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNION NACIONAL de TRABAJADORES
and its agent, Arturo Grant, Respondents
(two cases).

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNION NACIONAL de TRABAJA-
DORES and its agent, Alcides
Serrano, Respondents.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNION NACIONAL de TRABAJADORES
and its agent, Obreros en Huelga de Cat-
alytic, Respondents.

Nos. 75–1372, 75–1374 to 75–1376.

United States Court of Appeals,
First Circuit.

Argued Feb. 10, 1976.

Decided June 21, 1976.

Robert A. Giannasi, Asst. Gen. Counsel, Washington, D. C., with whom John S. Irving, Jr., Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Andrew F. Tranovich, Washington, D. C., were on brief for petitioner.

Paul Schachter, Hato Rey, P. R., with whom David Scribner, Elizabeth Schneider, New York City, Luis M. Escribano, Hato Rey, P. R., Ralph Shapiro, New York City, and Ismael Delgado Gonzalez, San Juan, P. R., were on brief, for respondents.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

In this consolidated proceeding, the National Labor Relations Board petitions this court for enforcement of the orders it issued against the Union Nacional de Trabajadores (Union) and its agents in four sepa-

rate unfair labor practice proceedings. The orders were issued to remedy numerous unfair labor practices that arose from violent incidents occurring at four Puerto Rican jobsites and involving several different companies and members and officials of the Union—all of whom are listed in the margin.[1] The major issues before us are the propriety of the Board's conclusions that the Union was guilty of the unfair labor practices found to have been committed and the appropriateness of the remedial features of the four orders.

In each of the four cases, the Board concluded that the Union had violated § 8(b)(1)(A) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(b)(1)(A), by threatening employees, supervisors, and/or outsiders under circumstances in which the result was interference with the rights conferred by § 7 of the Act, 29 U.S.C. § 157. In addition, in No. 75–1376, the Board also found that the Union had violated § 8(b)(4)(i) and (ii)(B) of the Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(B) by threatening and actually inflicting physical harm upon employees of third parties in order to force those third parties to terminate business relations with Catalytic, one of the companies with which the Union had differences. In each of the four proceedings, the Board

issued orders requiring the Union to cease and desist from the unfair labor practices found and from infringing in any other manner upon the § 7 rights of the employees.[2] In each case, the Board's orders require that the Union not only post copies of the notices at their offices and meeting places but also mail copies to all the employees of the companies that were involved and publish copies in every newspaper of general circulation in the Commonwealth.

In addition to finding that the Union had committed various unfair labor practices, the Board, in proceedings related to No. 75–1374, dismissed the Union's complaint that the employer had unlawfully refused to bargain with it and entered an order revoking the Union's certification as the Carborundum employees' collective bargaining representative and denying the Union the right to invoke the statutory procedures in aid of a demand for recognition until such time as the Carborundum employees demonstrate their support for the Union anew in an atmosphere free from the effects of the Union's coercion.

■■■ In opposing enforcement, respondents challenge the Board's substantive conclusions, the remedies it selected, and the procedures the Board followed in reaching its conclusions.[3] Because the substan-

---

1. To simplify matters, we will list the cases by the docket number in this court and by the parties to the proceedings below: No. 75–1372, the Union and its agent Arturo Grant *and* Macal Container Corporation (Macal); No. 75–1374, the Union and its agent Arturo Grant *and* The Carborundum Company of Puerto Rico and Carborundum Caribbean, Inc. (Carborundum); No. 75–1375, the Union and its agent Alcides Serrano *and* Jacobs Constructors Company of Puerto Rico (Jacobs); No. 75–1376, the Union and Comite Organizador Obreros en Huelga de Catalytic (Comite) *and* Catalytic Industrial Maintenance Co., Inc. (Catalytic) *and* Merck, Sharpe & Dohme Quimicas de Puerto Rico (Merck).

2. The Comite, which was found to be a separate labor organization, was not subjected to a broad order in No. 75–1376 because its activities had been confined to the Catalytic-Merck jobsite.

3. The Union's procedural objection is that the hearings it received before the various adminis-

trative law judges violated due process because greater steps were not taken to account for the fact that many of the witnesses and Union agents either spoke only Spanish or were much more adept in Spanish than English. The Board's practice in these hearings was to utilize translators whenever a witness did not understand or speak English well enough to testify in English. Only the English translation of the question and the response was transcribed. The parties, of course, were free to dispute the accuracy of any translation and to request that further questions be asked in order to clarify the meaning of the witness's response. Significantly, there is nothing in the record suggesting that any of the respondents were in any way prejudiced by any linguistic or translation errors; indeed, there is no indication that any material uncorrected errors occurred. We are satisfied that the Board's procedures were sufficiently reliable to satisfy due process.

Respondents propose various alternatives to the present practice—conducting the proceed-

tive and remedial challenges to the Board's orders present discrete issues, we will discuss them separately. The facts will be stated together with the substantive discussions. Several of respondents' arguments are too frivolous to warrant any discussion.

## I. The Union's Unfair Labor Practices [4]

*No. 75–1372.* Here the Board concluded that the Union and its agent and president, Arturo Grant violated § 8(b)(1)(A) by (1) brutally assaulting Macal's president, Manuel Calderon, in the presence of several of its employees, and (2) threatening Macal employees, on two separate occasions, with serious physical harm if they continued to work during a Union sponsored strike.[5] The Union maintains that none of these actions occurred under conditions in which they could constitute violations of § 8(b)(1)(A).

The assault on Macal's president occurred in Calderon's office on April 22, 1974, the day before a Union sponsored strike began. Although respondents concede that Grant's actions were reprehensible and violative of local law, they maintain that the admitted misconduct did not violate the Act because Grant did not have the required intent. They contend that the record clearly shows that the purpose of Grant's confrontation with Calderon was to force Macal to reinstate certain employees whom Grant mis-

takenly, but honestly, believed had been fired because of their Union sympathies and activities. In actuality, the employees had resigned. Respondents characterize Grant's actions as bona fide attempts to promote the § 7 rights of the former employees, and they maintain that such acts, as a matter of law, cannot form the basis for a § 8(b)(1)(A) violation. Secondly, respondents note that at the time of the assaults, there was no strike or other concerted activity in progress. They argue that ongoing concerted activity is a necessary condition for a § 8(b) violation because only then is there a possibility that the Union action will affect the exercise of § 7 rights. We find no merit in either contention.

Preliminarily, we observe that, although § 8(b)(1)(A) makes it an unfair labor practice for a labor organization to restrain or coerce *employees* in the exercise of the rights guaranteed by § 7, threats directed against a non-employee can constitute a § 8(b) violation if they occur in contexts in which employees are likely to learn of them. *See NLRB v. Imparato Stevedoring Corp.,* 250 F.2d 297 (3d Cir. 1957); *NLRB v. Furriers Joint Council,* 224 F.2d 78 (2d Cir. 1955). The reason for this rule is clear. An employee might reasonably regard such threats as a reliable indicator of what would befall him if he were to refrain from joining concerted activity in support of the

---

ings in Spanish, transcribing both the English translation and the Spanish testimony to facilitate correcting errors in translation, or supplying the charged parties with interpreters, as is required in criminal proceedings, *see United States ex rel. Negron v. New York,* 434 F.2d 386 (2d Cir. 1970). Although each of the proposed alternatives may well make it easier for certain charged parties to present their cases, each would entail considerable administrative inconvenience and expense. Here, where respondents' interest is only to avoid a civil sanction, we conclude that the governmental interest in retaining the present procedures outweighs respondents' interest in the additional procedural safeguards. *See Carmona v. Sheffield,* 475 F.2d 738 (9th Cir. 1973); *cf. Goldberg v. Kelly,* 397 U.S. 254, 262–64, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *United States v. DeJesus Boria,* 518 F.2d 368, 370–71 (1st Cir. 1975).

4. The Union challenges many of the findings of historical fact made by the administrative law

judges and affirmed by the Board. We have carefully considered each of the Union's challenges and have, in each instance, concluded that the Board's findings are supported by substantial evidence and must be affirmed. *See NLRB v. Universal Packaging Corp.,* 361 F.2d 384 (1st Cir. 1966).

5. The Board also found that the Union violated § 8(b)(1)(A) when, during a recess of the hearing before the administrative law judge, Grant threatened one of the employees with physical harm if he testified against the Union. Although respondents are precluded from challenging this determination by reason of their failure to object before the Board, *see* 29 U.S.C. § 160(e), we note that the evidence clearly supports the Board's findings and that the determination was legally correct. *See NLRB v. Dressmakers Joint Council,* 342 F.2d 988 (2d Cir. 1965).

Union. *See Taxi Drivers Union*, 174 N.L.R.B. 1 (1969). In reviewing a Board determination that a labor organization's violent assault of a non-employee constituted unlawful restraint and coercion of employees, the question is whether there is substantial evidence that the coercive conduct was likely to discourage legislatively protected employee activity. Evidence of specific intent to restrain or coerce employees is not required. *See NLRB v. Local 140*, 233 F.2d 539, 541 (2d Cir. 1956).

■ With this background, both of respondent's contentions seem meritless. The mere fact that Grant may have perceived himself as promoting only the interests of certain employees who supported his Union does not eliminate the possibility that the violent and brutal assaults on Macal's president in his office would have had a coercive effect on any employees who wished to refrain from joining concerted activity on behalf of the Union. Indeed, the assault occurred under conditions in which one would expect it to influence the actions of employees. It took place at the Macal plant, suggesting to employees that they would not even be safe at work if they were to oppose the Union, and arose from a Union dispute with management. An employee who either observed the assault or learned of it thereafter may well have construed it as a signal of the Union's probable response to anyone who might oppose the Union's program.

Nor can the fact that a strike or other concerted activity might not have been in progress at the time of the assault be conclusive of the absence of a likely coercive effect on protected activity. A strike was called the next day, and it is highly improbable that the violent assault would have been forgotten when the employees had to decide whether to join the strike. Under the circumstances, there was clearly sufficient evidence that the assaults were likely to chill the employees' exercise of their § 7 rights.

The Union also challenges the Board's conclusion that the threats directed against the Macal employees during the strike constituted violations of the Act. The first incident is a classic case of a § 8(b)(1)(A) violation. There Grant approached Jose Malabet and eight other Macal employees who were sitting in front of the plant waiting to go to work and repeatedly demanded that they not enter the plant. His final words illustrate the tone of his remarks: "This is Union Nacional and we kill people. So leave." [6] The second incident involved one Miguel Ortiz. Notwithstanding the Union's assertions, the Board was warranted in finding him an employee at the time of the incident. Although this was not nearly so flagrant as the first threat, it too involved a clear threat of bodily harm if an employee continued to report for work.

■ Respondents object to each of the Board's determinations on the ground that, insofar as the record shows, none of the individuals who were threatened were in fact coerced into honoring the strike. This argument misconceives the scope of § 8(b)(1)(A). As our earlier discussion indicates, it is not required that the victim of the Union misconduct actually refrain from exercising § 7 rights; indeed, the direct victim need not be an employee. A violation is established if the natural tendency of the coercive misconduct is to deter the exercise of § 7 rights by the employees who either witness it or learn of it. *See NLRB v. Service Employees Int'l Union*, 535 F.2d 1335, at 1337–1338 (1st Cir. 1976); *cf. NLRB v. Int'l Woodworkers of America*, 243 F.2d 745, 746–47 (5th Cir. 1957).

■ *No. 75–1375.* Here the Board concluded that the Union through its agents Alcides Serrano and Elias Samuel Castro-Ramos, had violated § 8(b)(1)(A) by commit-

6. In challenging the factual premises of the Board's findings regarding the Malabet incident, respondents make much of the fact that Malabet's reply to a question of the General Counsel's was initially mistranslated. The record, however, reveals that Malabet was re-examined on this point, that the Union entered no objection, and in any event that any mistranslation was minor, given the substantial independent evidence.

ting, in the presence of Jacobs employees, nine separate violent assaults or coercive acts against individuals who opposed the Union's objectives at the Jacobs plant. The Union does not challenge the findings that Serrano committed each of the acts with which he is charged. Nor does it dispute that these acts, if undertaken by a Union agent, would constitute violations of § 8(b)(1)(A). However, they maintain that Serrano was not a Union agent and that there is no other theory on which it can be held responsible for any of Serrano's misconduct. With respect to the acts allegedly committed by the Union's admitted agent Castro, the Union argues that the Board's findings were not supported by substantial evidence, a contention which we summarily reject.

To review the Board's conclusion that the Union was responsible for Serrano's actions, it is necessary briefly to summarize the factual background of the case. Serrano was an employee at the Jacobs plant in March and early April of 1974. Beginning on April 2 of that year, he led a strike of Jacobs employees. After the strike began, Serrano arranged to have the Jacobs employees execute authorization cards on behalf of the Union. Castro who is an organizer for the Union, testified that he was informed of the strike on April 1, the day before it began, and that the authorization cards had been passed out to the employees sometime during the previous week. Castro arrived at the Jacobs plant sometime early in the day on April 2, after the strike had begun. Shortly after he arrived, he, Serrano, and three other employees met with Jacobs officials to demand that Jacobs recognize and bargain with the Union. At this meeting Serrano identified himself as a Union organizer and, after encountering resistance from a Jacobs official, threatened him with violence. Castro neither contradicted Serrano's assertion that he represented the Union nor reprimanded him for the threat. In the course of the meeting both Serrano and Castro referred to the fact that they had signed authorization cards from a majority of the Jacobs employ-

ees. Later that day, Serrano made similar statements regarding his Union affiliation in Castro's presence and again was not contradicted. He also threatened several other individuals with violence, and Castro, once again, made no attempt to disassociate the Union's efforts from the threats. In fact, Castro subsequently engaged in similar unlawful conduct.

At the hearing before the administrative law judge, Castro testified that Serrano was the Union's "contact" at the Jacobs plant and admitted that Serrano had played an identical role during the Catalytic strike of November of 1973, the strike which gave rise to the orders which we review in No. 75–1376. Significantly, in the Catalytic proceedings, the Union admitted that Serrano had been its agent. Although this admission is not conclusive for present purposes, it is highly relevant.

■■■ On this record, we are satisfied that the Board properly held that the Union was responsible for all of Serrano's misconduct. Although Serrano was not an officer or paid employee of the Union and although there is no evidence that he was ever formally appointed a Union agent, we think there was enough circumstantial evidence of an agency relationship to warrant the Board's conclusion. Serrano's status as a Union "contact", the admitted agency relationship at Catalytic, the organizational activities on behalf of the Union, the fact that the organizational activities were closely coordinated with Castro's and apparently done with his knowledge, Castro's presumed power to appoint subagents to aid the Union's organizational activities, *see White Oak v. UMW*, 318 F.2d 591, 599–600 (6th Cir. 1963), and Castro's acquiescence in Serrano's assertion that he was a Union organizer, all provide circumstantial evidence from which reasoning minds could infer that Serrano was acting on behalf of the Union. *See NLRB v. Int'l Longshoremen's and Warehousemen's Union*, 420 F.2d 957, 959 (9th Cir. 1969); *Schauffler v. Highway Truck Drivers & Helpers*, 230 F.2d 7, 10–11 (3d Cir. 1962). We, therefore, uphold the

conclusion that the Union and Serrano violated § 8(b)(1)(A).[7]

*No. 75–1376.* Here the Board found that the Union and the Comite had, in the course of a labor dispute with Catalytic, flagrantly and repeatedly violated both § 8(b)(1)(A) and § 8(b)(4)(i) and (ii)(B). At the time of the incidents in question, Catalytic was performing construction work on the Merck premises, and it was the interference with Merck's operation which gave rise to the violations of the prohibition against secondary boycotts. Before the Board, neither the Union nor the Comite presented any defense to the charges, and both parties now concede that they are precluded from challenging the Board's substantive conclusions. We, therefore, need not discuss the substantive issues in this case any further.

*No. 75–1374.* Because this case presents the issues which we find the most troublesome, we will state the factual background in somewhat greater detail. Following a Board election, the Union was certified as the exclusive bargaining representative of certain Carborundum employees on May 22, 1974. Thereafter, the Union and Carborundum held a series of bargaining sessions for the purpose of negotiating a collective bargaining agreement. At the last negotiating session, which occurred on August 22, 1974, Carborundum submitted what it characterized its final contract proposal. Union President Grant stated that the proposal was not satisfactory and that it would be submitted to the membership with a negative recommendation. Grant then said the conference should end because he was at the point of starting a fight, and he ordered an employee member of the Union negotiating committee to cease talking because Grant was about to start slapping people. Carborundum's representative then left the

session because "things [were] getting bad [there]."

The parties subsequently made arrangements for a further bargaining session to be held on September 18 at the San Juan offices of the Department of Labor. No meeting, however, was held because of the events of September 17. On the morning of that date, shortly before the beginning of the working hours, Grant and three other Union agents appeared at the Carborundum plant for the ostensible purpose of making arrangements for transportation to the next day's bargaining session. When a Carborundum supervisor, Ortiz Cano, observed the four men talking to an employee, Jenaro Rosario, the supervisor told the Union agents that unless they had permission they were not permitted at the plant when the office personnel were not there. At that point the four Union agents followed the supervisor into an adjoining production control room and beat him to the floor. The Union agents then approached Rosario again. In their earlier conversation, they had asked him whether he had been collecting signatures for a Union deauthorization petition, and he had given a noncommittal answer. When they returned to Rosario, the Union agents held him and slapped him. As they left, they made the comment, "This one we are about to kill."

Because of the unprovoked violent attacks on its employees, the Carborundum representatives did not appear at the bargaining session scheduled for September 18. On the 19th, the four Union agents again entered the plant, ignoring the plant guard's protest in doing so. When inside, they approached a responsible official and inquired why Carborundum's representatives had not attended the bargaining ses-

---

7. Even if there were no agency relationship, we note that the Union would have been responsible for much, if not all, of Serrano's misconduct. Serrano's first unlawful acts occurred in Castro's presence and under circumstances in which they were associated with the Union's efforts at the plant. Castro not only made no effort to disapprove Serrano's conduct; he engaged in similar misconduct himself. Since the Union was aware of its "contact's" unlawful activities on its behalf and made no attempt to discourage it, the Union's silent, if not direct, approbation renders it responsible for all of Serrano's similar subsequent misconduct. *See NLRB v. Bulletin Co.*, 443 F.2d 863, 867 (3rd Cir. 1971); *National Cash Register v. NLRB*, 466 F.2d 945, 961 (6th Cir. 1974). *Compare NLRB v. Service Employees Int'l Union, supra*, 535 F.2d at 1337–1338.

sion. They were informed that there would be no further bargaining until the violence ended. The Union agents then left the plant. Finding that 40 to 50 employees were on their lunch breaks, Grant addressed them with a loudspeaker. In the course of a five to ten minute speech, he stated that Carborundum was refusing to negotiate, that the Union would compel them to do so, and that, if Carborundum were closing the gates, it was useless because the Union could knock them down.

On these facts the Board found that the Union had violated § 8(b)(1)(A) by threatening physical violence at the August 22 bargaining session, physically attacking two employees and threatening to kill Rosario on September 17, and threatening to break down the gates of the Carborundum plant on September 19. The Board dismissed the Union's complaint that Carborundum's refusal to bargain violated § 8(a)(5), reasoning that the Union's violent misconduct and failure to give adequate assurances that it would cease excused the employer from any obligation to bargain. Finally, in a technically separate proceeding, the Board revoked the Union's certificate of representation. The Union attempts to challenge each of these actions, but at this point we will consider only the Board's conclusion that § 8(b)(1)(A) was violated.

■ To take the most flagrant charge first, there is no question but that the attacks on Supervisor Ortiz and employee Rosario and the threat against Rosario's life constituted coercive conduct violative of § 8(b). Since the attacks and threats against Rosario followed an accusation that Rosario was seeking to decertify the Union, it is hard to conceive of a clearer example of coercive interference with an employee's § 7 right to oppose representation by a given labor organization. See General Truck Drivers v. NLRB, 410 F.2d 1344, 1346–47 (5th Cir. 1969). The unprovoked violent attack against Supervisor Ortiz also violated § 8(b)(1)(A) since it occurred in Rosario's presence and since the natural consequence of it would be further to impress upon him what might befall him if he

continued to oppose the Union. See NLRB v. Int'l Woodworkers of America, supra, 243 F.2d at 746–47; NLRB v. Local 140, supra, 233 F.2d at 541.

■ The other incidents present more difficult problems. The statements Grant made during the August 22 bargaining session did threaten violence. Employees could have interpreted the remarks as indicating what might befall them in the event that they opposed the Union's position on any bargaining issue. Although we recognize that employees might not have perceived Grant's remarks as threatening, cf. NLRB v. Teamsters Local 745, 462 F.2d 201, 203 (5th Cir. 1972), the Board's contrary conclusion is plainly supported by substantial evidence.

■ More troublesome is the determination that it was a § 8(b) violation for Grant to state, in the course of a five to ten minute speech to the employees, that the Union would tear down the gates if Carborundum closed them and that not even the police could stop the Union. We recognize that destruction of an employer's property can restrain the exercise of § 7 rights by threatening employees' jobs and by creating a general atmosphere of fear and violence, see New Power Wire & Electrical Co. v. NLRB, 340 F.2d 71, 72 n.1 (2d Cir. 1965); NLRB v. UMW, 429 F.2d 141, 147–48 (3d Cir. 1970), and there may also be situations in which threatening such destruction could violate § 8(b)(1)(A) either by impressing upon employees the risks they would run if they were to oppose the Union or by threatening the employees' jobs. Here, however, we find it impossible to believe that Grant's statements would have been so interpreted. The remarks were made in the course of a rather long speech in which Grant attacked the company for refusing to bargain and in which he requested employee solidarity in the face of the company's perceived intransigence. The statements—which were directed at the gates, not the plant or any integral part of its operations—would themselves be relevant only in the event of a lockout. Significantly, a lockout neither had been threatened nor seemed likely at

the time of the speech. In context, the threats, which were temporally remote from earlier illegalities and dealt with different subject matters, were hyperbole, with at most metaphorical significance.

█ Such speech should not lightly be subjected to sanction. *See generally Letter Carriers v. Austin*, 418 U.S. 264, 270–78, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). A Union's interest in communicating its views to its membership and pleading for a united front is an important one and should not unnecessarily be restricted. We observe that such communication is not always likely to be parlor discourse. We recognize that there may be occasions where such speech, not improper if viewed in isolation, may be so temporally or thematically associated with previous unlawful acts that it may be viewed as coercive conduct. But there was no persuasive showing here that Grant's speech was likely to have had a coercive effect on the employees' exercise of their § 7 rights. We therefore modify the Board's order in No. 75–1374 to exclude any reference to Union threats to damage Carborundum's property.

## II. Remedial Issues

█ *The Broad Orders.* The Union challenges the Board's imposition of orders which require it to cease and desist not only from the specific unfair labor practices it was found to have committed but also from "in any manner restraining or coercing employees in the exercise of the rights guaranteed by Section 7 of the Act." We are satisfied that the imposition of these broad orders was entirely proper under the circumstances. It is well established that, when a record discloses persistent attempts to interfere with legislatively protected

rights by varying methods, the Board may restrain a labor organization from committing similar or related unlawful acts in the future. *See NLRB v. Express Publishing Co.*, 312 U.S. 426, 436–38, 61 S.Ct. 693, 85 L.Ed. 930 (1941); *NLRB v. Local 476*, 280 F.2d 441, 443 (1st Cir. 1960). The record in these cases amply supports the Board's conclusions that the Union has demonstrated a proclivity to violate the § 7 rights of employees. The Union not only has been found to have committed numerous violations of § 8(b)(1)(A) in five separate cases.[8] Its agents have stated, both in the course of their unlawful activities and in the hearings before the Board, that they do not regard themselves as subject to the authority of the Act and that they feel no obligation to conform their conduct to its requirements.[9]

█ *The Mailing and Publication Requirements.* Secondly, the Union challenges each order's requirement that copies of the notices be mailed to each employee of the companies involved and be published in all Puerto Rican newspapers of general circulation. We reject these challenges. The Board clearly has the power to fashion its orders in a manner that will ensure that their contents are communicated to all employees whose rights are affected. Widespread communication is aimed at counteracting the coercive effects of the § 8(b)(1)(A) violations. *See Texas Gulf Sulphur Co. v. NLRB*, 463 F.2d 778, 779 (5th Cir. 1972); *J. P. Stevens & Co. v. NLRB*, 461 F.2d 490, 495 (4th Cir. 1972). Here, where many of the victims of the unlawful Union activities were not Union members, the remedy of ordering merely that copies of the notices be posted at the Union offices and meeting places would plainly be inadequate. The mailing requirement is an ap-

**8.** In addition to the unfair labor practices from the four cases we review today, the Board also noted that the Union had been found to have violated § 8(b)(1)(A) in *Union Nacional de Trabajadores and its Agent Radames Acosta-Cepeda (Surgical Appliances Mfg., Inc.)*, 203 N.L.R.B. No. 106 (1973).

**9.** We summarily reject the Union's argument that § 8(b)(1)(A) of the Act is unconstitutionally vague. We also reject its contention that the

broad orders were unlawful because the General Counsel did not give them notice that he would seek broad orders. Even assuming, *arguendo*, that notice is required and was not given here, the Union could not have been prejudiced by any failure to receive it. The broad orders were predicated upon the Board's findings in the other unfair labor practice proceedings, and these findings could not have been attacked.

propriate device to help insure that the victims of the Union's wrongdoing learn of the Board's actions.

The *further requirement* that the notices be published in all newspapers of general circulation helps insure that all interested persons will receive notice. *See Alexander Stafford Corp.*, 118 N.L.R.B. 79, 82 (1957), *enf'd sub nom. Int'l Ass'n of Heat & Frost Insulators v. NLRB*, 254 F.2d 955 (D.C.Cir. 1958). Moreover, where the violations are flagrant and repeated, the publication order has the salutary effect of neutralizing the frustrating effects of persistent illegal activity by letting in "a warming wind of information and, more important, reassurance." *J. P. Stevens & Co. v. NLRB, supra*, 417 F.2d 533, at 538–40. These orders are well within the Board's broad discretion to fashion remedies that will effectuate the policies of the Act. *See Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

*The Decertification Order.* This brings us to the single most troublesome issue in this case: the propriety of the Board's decertification of the Union as the Carborundum employees' collective bargaining representative and the related question whether it was proper to dismiss the Union's § 8(a)(5) complaint against Carborundum. The Board claims that we lack jurisdiction to review either order. Although we conclude that the Board is technically correct on both points, we will express our general views on the propriety of the decertification order to provide guidance in the event that the Union is able to challenge the decertification order in a subsequent proceeding.

There is no escaping the fact that we lack jurisdiction to review the Board's dismissal of the § 8(a)(5) complaint. The present consolidated proceeding was insti-

tuted by the Board pursuant to § 10(e) of the Act, 29 U.S.C. § 160(e), to obtain enforcement of its orders in these four unfair labor practice proceedings. The Union did not file a petition under § 10(f), 29 U.S.C. § 160(f), for review of the unfavorable termination of its § 8(a)(5) complaint. We have held that the exclusive means for a losing party to obtain judicial review of an unfavorable unfair labor practice determination is to file a petition for review under § 10(f) of the Act. *NLRB v. Oil, Chemical and Atomic Workers*, 476 F.2d 1031, 1033–34 (1st Cir. 1973). The fact that the losing party is a defendant in an enforcement proceeding involving a related unfair labor practice determination does not place the Board's unfavorable ruling before the court. *Id.; cf. Spound v. Mohasco Industries, Inc.*, 534 F.2d 404, at 410–411 (1st Cir. 1976).

The Board contends that the Union's failure to seek appellate review of the Board's dismissal of the § 8(a)(5) complaint also precludes it from obtaining review of the Board's order revoking the Union's certificate as a collective bargaining representative. It reasons that a decision by the Board in a representation proceeding under § 9 of the Act is not a reviewable final order under § 10, *see A.F. of L. v. National Labor Relations Board*, 308 U.S. 401, 409–12, 60 S.Ct. 300, 84 L.Ed. 347 (1940), and that such an order becomes reviewable only when it is the predicate for a Board decision in an unfair labor practice proceeding. *Id.* Since the decertification order does not appear to have been the premise for the Board's dismissal of the Union's § 8(a)(5) complaint, it is doubtful that the union could have obtained review of the revocation order by appealing the dismissal of its unfair labor practice complaint.[10] But that point need not concern us. Since the Union did not appeal the dismissal of its § 8(a)(5) complaint and since the decertification order did not serve as the predicate for any of

---

10. The Board dismissed the Union's complaint not because the Union's certificate had been revoked but rather because, at the time of the refusal to bargain, the Union had engaged in violent misconduct which excused the employer from his duty to bargain and had not provid-ed the employer with adequate assurances that the violent misconduct would not recur. Under the Board's theory of reviewability, therefore, it does not seem that an appeal of the dismissal of this § 8(a)(5) complaint would have placed the decertification order before this court.

the final orders we review today, we are presently without jurisdiction to review the revocation of the Union's decertification.

It is possible, however, that the Union could obtain appellate review of the revocation order by filing a second § 8(a)(5) complaint and filing a § 10(f) petition for review of the ultimate dismissal thereof. *See* Meltzer, *The NLRA and Racial Discrimination: The More Remedies, The Better*, 42 U.Chi.L.Rev. 1, 21 n. 102 (1974). Since decertification under the circumstances of this case strikes us as somewhat novel and since the Board's order implicates issues that were not explicitly addressed by the Board, we think it useful to state our thoughts and concerns and thereby provide the Board with guidance in the event the case comes before it again.

Both the courts of appeals and the Board have recognized that there are circumstances in which it is appropriate either to refuse to certify or to revoke the certification of a Union that, presumptively at least, enjoys the support of the majority of the employees in an appropriate bargaining unit. *See, e. g., NLRB v. David Buttrick Co.*, 361 F.2d 300 (1st Cir. 1966); *Int'l Brotherhood of Teamsters, Local No. 671*, 199 N.L.R.B. 994 (1972); *Hughes Tool Co.*, 104 N.L.R.B. 318 (1953); *cf. NLRB v. Mansion House Center Management*, 473 F.2d 471 (8th Cir. 1973). Although the Board's authority to take such action is plainly not unlimited, *see Leedom v. Int'l Union*, 352 U.S. 145, 77 S.Ct. 154, 1 L.Ed.2d 201 (1956), we agree that the Board may deny representational status to a Union which has breached its obligations to represent the best interests of its constituents, *see Catalytic Industrial Maintenance Co.*, 209 N.L.R.B. No. 101 (1974), or which has a relationship with a third party that may preclude the establishment of a normal bargaining

relationship with the employer. *See NLRB v. David Buttrick Co., supra; Medical Foundation*, 193 N.L.R.B. 62, 64 n. 19 (1971); *Bausch & Lomb Optical Co.*, 108 N.L.R.B. 1555, 1559 (1954).

None of these cases clearly establish that the Board may decertify a Union that engages in serious violent misconduct in the course of collective bargaining and which attempts to coerce the employees in the unit to refrain from seeking the Union's decertification.[11] We note that there are alternative means of attempting to control such conduct. Insofar as such misconduct affects the bargaining process, the normal remedial measure would be to refuse to enter a bargaining order on behalf of the Union until such time as the Union provides adequate assurances that there will be no repetition of the violent and coercive conduct. *See Cascade Corp.*, 192 N.L.R.B. 533, 534 n. 2 (1971). Insofar as it interferes with the employees' § 7 rights, the normal corrective action would be § 8(b)(1)(A) measures. Nevertheless, given that the overriding purpose of the Act is the promotion of industrial peace, we decline to take the position that the Board does not, in some cases at least have the implied authority under § 9 to deny representational status to an elected Union that has engaged in violent misconduct so aggravated as to preclude the maintenance of normal collective bargaining relationships. Because of the important interests that are at stake, however, we think that a decertification order is an extreme measure and should be entered only when the Board has first demonstrated that there are no equally effective alternative means of promoting the objectives of the Act. *Cf. Jacob Siegel Co. v. FTC*, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888 (1946).

11. Here the Union notes that the decertification occurred less than one year after the Board sponsored election, and it argues that the Board's "one year rule", *see Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954), precluded the revocation of its certificate. This contention is meritless. The one year rule has never been conceived of as affording the elected Union an absolute right to serve as collective bargaining representative until 365 days have passed. *See id.* at 98–99. It was not intended to protect the representational status of a labor organization that had violated its obligations as a bargaining representative and frustrated the collective bargaining process.

The value at stake, of course, is the interest of a majority of the Carborundum employees to be represented ·by their duly selected collective bargaining representative. Here, where the Union has been selected the representative after a representation election, the employees have supplied the most reliable evidence of their desire to be represented by a particular labor organization. *See NLRB v. Gissel Packing Co.,* 395 U.S. 575, 602–03, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Before taking action that nullifies, even temporarily, the results of the election, we think that the Board should take steps to assure itself and a reviewing court that the action is necessary to protect the collective bargaining and representational processes themselves.[12] It should explicitly find that no alternative remedy—either § 8(b)(1)(A) remedies or an order delaying bargaining until the Union provides adequate assurances that the misconduct will not recur—will be an equally effective means of protecting the values of the Act.

The Board stated the grounds for its decision to revoke the Union's certification in these words:

"This labor organization, by its brutal and unprovoked physical violence in this case and by its extensive record of similar aggravated misconduct . . . has evinced an intent to bypass the peaceful methods of collective bargaining contemplated in the Act. . . . It has consistently exhibited an utter disregard for the orderly and lawful processes available under the Act, and instead deliberately resorted to self-help through violence.

. . . .

. . . we cannot continue to certify as a qualified bargaining representative a labor organization such as Respondent Union which does not lawfully pursue its representation rights and is openly defiant of the authority of the Board and the teachings and purposes of the Act. Due to the atmosphere of fear and coercion generated by the Union's unlawful conduct, no constructive bargaining on behalf of the employees it represents is feasible. Thus, the Union has corrupted and frustrated the representative scheme of bargaining envisaged by the Act.
. . . ."

Although, if we were actually reviewing this decision, we might read into it an implied rejection of the efficacy of less drastic approaches, we would do so because of our awareness of the absence of any forewarning of our concerns. In the present jurisdictional posture of this case, we have assumed the privilege of exposing our apprehension—without immediate effect—that. the Board's approach may be breaking new ground with insufficient sensitivity expressed on the record to the interests at stake.

Here, the Board did not explicitly engage in any assessment of the adequacy of any alternative means of securing a return to normal collective bargaining. Moreover, a principal factor in the Board's decision apparently was its belief that revoking the Union's certificate would be an effective means of remedying the pervasive and flagrant misconduct of the Union at other Puerto Rican jobsites. But a desire to punish misconduct that occurred at unrelated locations would not be a permissible basis

---

12. It is the fact that an election has been held which distinguishes the case at bar from cases such as *Laura Modes,* 144 N.L.R.B. 1592 (1963) and *NLRB v. World Carpets of New York, Inc.,* 463 F.2d 57, 62 (2d Cir. 1972), which hold that a Union which has engaged in coercive misconduct, comparable to the employer's, has forfeited its claim to the bargaining order to which it would otherwise normally be entitled under *NLRB v. Gissel Packing Co., supra.* In this line of cases, the Union's sole claim to representational status arises from possessing a card majority, a fact which, in the absence of employer misconduct, would entitle it only to petition for an election. *See Linden Lumber Division v. NLRB,* 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974). When the Union has been selected bargaining representative after an election—"a solemn and costly occasion, conducted under safeguards [ensuring] voluntary choice," *Brooks v. NLRB,* 348 U.S. 96, 99, 75 S.Ct. 176, 179, 99 L.Ed. 125 (1954)—there is a clear interest in having the results respected and in avoiding the cost and inconvenience of further representational proceedings. Absent some showing of reasonable necessity, nullification of the election results would not seem proper.

for revoking the Union's certification. What is at stake is not only the interest of the Union but also the interest of the employees at the Carborundum plant to be represented by the Union of their choice. The protection of this interest requires that the sole permissible objective in revoking a Union's certification is to promote normal representation and collective bargaining at the Carborundum plant itself. Union misconduct at unrelated jobsites is relevant only to determine whether alternative measures short of decertification would be equally effective means of promoting the objectives of the Act.

If this case were to come before the Board again, we suggest it address the following issues. First, it should consider the effect of the Union's misconduct *at the Carborundum plant* on the operation of the representational and collective bargaining processes. If it finds that constructive bargaining is not feasible, it should then consider whether the objectives of the Act could be promoted equally well either by an order excusing the employer of his bargaining obligations until the Union has provided adequate assurances that the misconduct will not recur or by normal § 8(b)(1)(A) remedies. At this point, it will be proper to consider the evidence of the Union proclivity for unlawful conduct since it is relevant as to the likelihood that less drastic measures will be effective. We emphasize that, because of the important employee interests that are at stake the focus should be on promoting peaceful collective bargaining and not on fashioning sanctions to deter Union misconduct. We recognize that the two may often be hard to separate.

We do not suggest that a decertification order was unwarranted on this record. Nor do we wish to encourage the Union to institute further proceedings. Were we actually called upon to review a decertification order in this or a similar case, we naturally would give the usual deference to the Board's application of the correct remedial criteria to the facts before it. *See Fibreboard Paper Products Corp. v. NLRB, supra,* 379 U.S. at 216, 85 S.Ct. 398.

We note that a Union which has threatened the members of the employer's bargaining team, which seeks to retain its majority status by terrorizing the opposition rather than by serving as an effective bargaining representative, and which has a long history of flagrant misconduct is an apt candidate for having its certification revoked. Here, we state our views solely for the purpose of stating the concerns the Board should address on the record in such cases.

\*     \*     \*     \*     \*     \*

*We grant enforcement of the Board's orders in each of the four cases, except that in No. 74–1374, the Board's order is modified to exclude any references to the threats directed at Carborundum's gates.*

LEVIN H. CAMPBELL, Circuit Judge (concurring and dissenting).

I concur in so much of the court's opinion as affirms the Board's disposition, but I dissent from the court's modification in 75–1374 excluding the Board's inclusion of the threats made on September 19. In the give and take of labor negotiations, language of the sort used by Grant might normally be taken only as hyperbole. Given, however, Grant's previous resort to threats and—just two days earlier—to violence within the plant, I think the Board could reasonably and properly interpret statements that the Union would tear down the gates and that not even the police could stop it as conveying a coercive threat. It was plain by the nineteenth that when Grant threatened violence, he was not simply being poetic. I can well understand my colleagues' concern not to chill speech. However, the values associated with collective bargaining under the National Labor Relations Act, as well as with the first amendment itself, cannot endure in an atmosphere of threats and violence; and I see nothing excessive in the Board's reaction here.

I agree with the court that we are without jurisdiction to review the decertification order, and I therefore disassociate myself from the last part of the opinion, where the court puts forward certain "thoughts and concerns" as to decertification. Doubtless

there are occasions when it is appropriate for a court to offer prospective guidance to an administrative agency—for example, when remanding for further proceedings. But I think the practice is questionable with respect to a matter as to which we are now without jurisdiction. No one can deny that decertification is a serious step, but precisely because the considerations are delicate, it seems preferable to avoid advisory statements.